Our second case of the day is Sanders v. Moss. Mr. Alleluia-Feinberg Good morning. May it please the court. This case is about an egregious lack of care in which defendants who are trained, licensed mental health professionals refuse to provide mental health care to their patient, a prisoner held in eight straight years of solitary confinement, and refuse to exercise their clinical judgment to recommend his release from solitary. The evidence showing defendants acted with deliberate indifference falls into two categories. First, the defendants failed to provide minimally competent care to Mr. Sanders. Passing by his cell to eyeball him is not care at all, and there were huge gaps between any attempts at providing psychotherapy to treat his mental illness. Second, defendants failed to exercise their clinical judgment in the discipline process. They were given an opportunity to identify deterioration to their patient caused by solitary, and there was even a procedure for them to recommend pulling Mr. Sanders out of solitary altogether, but defendants did what no minimally competent medical professional would do. They did nothing at all. Whether that rises to the Eighth Amendment standard for deliberate indifference is a factual question reserved for the jury, but what the district judge did here was find the facts himself. The parties dispute, for instance, what defendants knew, and yet the district court states on page 35 of its opinion that based on the totality of the information available to defendants during their encounters with plaintiff, the court finds that they were not actually aware of the alleged impact segregation and his disciplinary restrictions had on his mental health. This is reversible error as the district court weighed the evidence and engaged in fact-finding. For the first bucket, when you look at the evidence, defendants' visits with Mr. Sanders almost exclusively consisted of non-confidential, self-front interactions that were just eyeballing Mr. Sanders or lasted no more than five to ten minutes. That's not care at all. For over a year prior to his 2015 suicide attempt, Mr. Sanders did not receive any individual psychotherapy in the normal course of treatment outside of a crisis. Counsel, it might not be care. Would you consider it monitoring? I think it doesn't count as care for his mental illness, but it may rise to the level of making sure he's not actively suicidal, but that isn't what's required when he's diagnosed with bipolar disorder and schizoaffective disorder and other serious mental illnesses. And that Mr. Sanders had a history of suicide. Even before defendants started his care, it's in the record that he had attempted suicide in 2010 and 2012, and so they knew that he already had a risk of harm from these serious mental illnesses and from solitary confinement. And as I was mentioning the various gaps in care, that was a year gap prior to his 2015 suicide attempt, and after the crisis abated from that 2015 suicide attempt, he did receive sporadic psychotherapy, but then these visits also stopped entirely again. After receiving no care for four months, Mr. Sanders attempted suicide again in 2016. Defendants were his care team. He is their patient, and they did not provide care. In fact, we have testimony on this from our expert, Dr. Grassian, that the lack of care provided by defendants was outrageous and that defendants, quote, failed to meet their professional responsibility. The second bucket is that defendants also repeatedly acted with deliberate indifference by recommending more solitary and yard restriction and not advocating for Mr. Sanders to be pulled out of solitary. For example, Defendant Hogg testified that she didn't recall a prisoner ever being contraindicated for solitary, and Defendant Duckworth admitted she would still recommend solitary even knowing it would affect a prisoner's mental health. That's deliberate indifference. With regard to that second bucket, I think that one of the challenges that you have to deal with is the fact that the procedures were dictated or established by IDEOC, and in the end, through all the various levels of appeals or what have you, it is the IDEOC that determines what exactly the particular punishment is for the particular infraction. I wonder if you can point us to some authority that says that not actively advocating for an inmate to a third-party decision-maker is a violation of the Eighth Amendment. Well, our position here is that the failure on defendants' part was in not exercising their clinical judgment. But they did exercise it, perhaps not in the way that you think they should have, but didn't they have recommendations about how long of solitary confinement they thought was appropriate given his mental health issues and other recommendations along the way? Our position is that this was a failure to exercise judgment. I understand that's your position, but I guess that's not necessarily the answer to my question. My question is, didn't they actually have input in the process by filling out the 443 forms, I think they are, and participating in the proceedings? And so in that way, they kind of gave their view. Again, I think that your position would be that their view was completely wrong and misguided, but it's still their view. And I wonder whether, again, you can point us to some authority, either from this circuit or the Supreme Court, that would be to an analogous situation where expressing one's professional view in that manner would constitute deliberate indifference. I'm not sure I have a case to point you to, but I can address your question. I think we're not trying to hold defendants liable for the ultimate security decision made by IDOC. What we're arguing is that a reasonable jury could find that their input into the discipline process constitutes deliberate indifference because the IDOC called on defendants to make a clinical judgment, to identify deterioration, to identify whether a prisoner is being harmed by further solitary or has already been harmed by solitary. And the IDOC guidelines show that they would have been required to defer to the mental health professionals, and that there was even a procedure that mental health professionals could raise that a prisoner needs to be pulled out of solitary altogether if that was taken to the warden. And there were many opportunities for defendants to weigh in, to provide clinical judgment, to look at the case and the harm to him, the past suicide attempts, the suicide attempts that they saw and treated him for, and to do something. But they did nothing. And another point there is that they're also not providing the necessary mental health treatment at the same time that this is going on. So while he remains in solitary confinement, while he's continuing to deteriorate in his mental illness, defendants are not providing the psychotherapy. They're not providing the individualized care that he needs. And then when he commits an offense that may carry a solitary punishment, they don't weigh in about his mental health there either. And the statement I had mentioned before about Defendant Duckworth recommending solitary even when it affects mental health shows the complete lack of consideration that they're making for Mr. Sanders. Well, if you are not contesting the actual punishment and you are focusing on that quality or the type of input that the mental health professionals provide in the process, do you then have a causation problem? Because the final decision as to what the particular punishment would be is not made by the mental health professionals at all. Our position is that that's a question for a jury to find. Causation is a core factual question here. And we have ample evidence in the record to show that defendants had opportunities that they knew, for example, that they knew that any time, this is a quote, any time there's a suicide attempt, it's inadvisable to place a prisoner back in solitary. That's at Appendix 250. And they were also aware, another testimony, that a restriction on out-of-cell exercise can affect mental health. That's Appendix 197. So they were aware of the risk to him and they failed to act in a way that constitutes deliberate indifference. And we believe that a reasonable jury could find their actions, both in the context of providing care and in the context of failing to advocate and exercise clinical judgment in the discipline process, both constitute instances of deliberate indifference. Let me ask Judge Lee's question in a different way. There is what Judge Calabresi would call a tragic choice, a trade-off between a loss of mental health of somebody like Sanders and a loss of physical health of inmates in the general population exposed to a violent and mentally ill inmate. It's a terrible trade-off. But in what sense is that a medical choice for the defendants rather than a penological choice for people who are not parties to this litigation? The defendants were responsible for Mr. Sanders' mental health care. He was their patient and they were his care provider. They were not responsible for the ultimate penological decision. I'm not asking about the care provided while he was in solitary. I'm asking about your argument that they were supposed to recommend that he be released from solitary. That sounds like a penological rather than a medical decision. And so I'm asking, in what sense is that a medical issue for these defendants rather than a penological issue for the warden? I understand what your question is. I believe that the testimony of Wexford's 30b6 witness— No, I don't think this is a question of testimony. Well, the specific question that the penological—that IDOC had asked for defendants to answer, that they had called upon them to weigh in on, is whether there was, quote, deterioration of a mentally ill patient due to solitary. So that punts the question to them as to what is his mental health state, what is the effect of solitary, and would continued solitary have further detriment on his mental health? And if there are no further questions, I'd like to reserve the rest of my time for rebuttal. Certainly, counsel. Thank you. Ms. Toysher. May it please the court. Mr. Sanders was first treated for his intermittent explosive disorder, his impulsivity, and his depression before he was ever incarcerated. It began at the age of 15, and it continued once he was incarcerated. I represent Wexford and five individual social workers who provided mental health treatment to Mr. Sanders as part of a team in the prison system. In addition to my social workers, he was seen by psychiatrists who assessed his condition, diagnosed his condition, provided his medications, and provided assessments about how he should be handled. He was also seen by psychologists who provided counseling. He was also seen by the department's director of mental health, and he was seen by other counselors. Counsel ignores the treatment that Mr. Sanders received from all of these other professionals. He acts as if when he wasn't being seen by one of my five social workers, he wasn't being seen at all, and that's just not the case. He claims that individual defendants failed to provide treatment throughout 2014 and 2015, but he failed to mention that he was seen 17 times during that interval by psychologists, psychiatrists, the department medical health director, and other counselors. Mr. Sanders knew he could access mental health care in a variety of ways, from guards walking through the gallery when he saw people in segregation. He had individual counseling sessions. He could have submitted a kite asking for psychological care. He had all those vehicles open to him to request care. The issue here is what these individual defendants did when they interacted with Mr. Sanders. How did they assess him? Did they exercise their professional judgment, as you mentioned, Judge Lee? And were there recommendations within their professional judgment? And the answer to that is yes. I first have to address Counsel Staten in his brief about Andrea Moss. He claims that Andrea Moss told Mr. Sanders directly that she wouldn't see him unless he was suicidal. That's not accurate. Mr. Sanders said three times at his deposition that on one occasion he asked Ms. Moss to stop while she was walking in front of his cell, and she ignored him. That was Mr. Sanders' testimony. She didn't respond to him. A correctional officer allegedly said something to Mr. Sanders along the lines of, Ms. Moss won't see you because you're not suicidal. And beyond that, Mr. Sanders also admitted that he was seen by another counselor that very day, and he told that counselor he was not suicidal. Ms. Moss spent 30 to 40 minutes with Mr. Sanders when she saw him in individual sessions. She assessed his mental stability. Once he was refusing to take his medications, and she asked a psychiatrist to see him. Another occasion he was angry his shoes had been removed, and so she put him on 10-minute watch because she was worried he was agitated. Her records don't show a pattern of indifference. She spent a lot of time with this inmate. She exercised her professional judgment, and she recommended elevated care when it was called for. Could I ask you a question? Just kind of stepping back a bit. So you mentioned that there were these other mental health care professionals providing care to Mr. Sanders during the same period of time. How do the, I guess you referred to them as social workers, you know, how do they fit into the overall care that Mr. Sanders gets? Are they, can he only see specialists on their recommendations? What is their role in this care, and is there someone else overseeing all of it? The mental health unit director for the IDOC oversees the whole thing. She has the ultimate authority as to whether he needs to go to outside care or whether he needs to be transferred to the residential treatment program. The social workers fit into this hierarchy in that they perform the segregation rounds, which plaintiff downplays, but that's their opportunity to look at Mr. Sanders and see is he agitated? Is he taking his medications? How does he look? Is he cooperative? Is he stable? In addition to the counseling sessions with my counselors, the psychiatrist saw Mr. Sanders about every two to three months. Psychologists saw him about every two to three months over the course of all of this care. And my social workers, their primary responsibility was what does this mental stability look like and does he need more help? But he would be seen by these other psychiatrists and psychologists regularly without our intervention or without our requesting that kind of care. Ms. Hay saw him on segregation rounds. He voiced no concerns. One time he said he was a little depressed over a court appearance, but expressed no concerns. She saw him several times in group sessions, and her group notes were consistently positive, saying that he was utilizing his coping skills. He was logical. He was appropriate. There was no reason, based on her interactions, for her to do anything to elevate his care. Mr. Nelson, same thing. He evaluated him as stable and appropriate, saw him on his segregation rounds, and one time when he was told by Mr. Sanders that his medication had expired, he asked a psychiatrist to renew his medications, and that was done. The overall pattern here is that these social workers, in their interactions with him, used their professional judgment to determine whether he needed more care, and when he did, they requested it. On the adjustment committee involvement, this is a maximum security prison with 2,500 very violent inmates. The IDOC has instituted rules for violations of conduct and the maximum penalties that can be imposed for those rules. There is a significant penological concern here that plaintiff has virtually ignored in his briefing. This court has said in the past that each violation has to have proportional discipline. This court has said that treating stacked discipline as a single sanction produces the ridiculous consequence of enabling a prisoner simply by recidivating to generate a colorable Eighth Amendment complaint. Each of these violations has to have proportional discipline, and this court has endorsed that. This court has rejected prior plaintiff's claims in the Pearson case and more recently in the Johnson case. You can't stack these violations and claim an Eighth Amendment violation. You have to look at whether each disciplinary ticket had a proportional, I'm sorry, whether each violation was given a proportional disciplinary measure. Only three of the social workers that I represent were involved in authoring those Form 43s. Duckworth and Lanterman were never involved in the 443 process. As to the other three, Ms. Moss authored two of those 443 forms. She did not recommend a segregation term during the first Form 43 form, and in the second form she said he was unstable, and she told the Adjustment Committee, please consider his mental health when you're assessing his discipline. Ms. Haig was involved in one 443 form, and she said, even though he's stable, I'm asking you to limit his segregation placement because it's likely to impact his mental health. That's not someone who's criminally and recklessly disregarding his mental health. Mr. Nelson was involved in two Form 43 forms, and both occasions he found Mr. Sanders to be stable. In one he proposed a two-month segregation term, and in the other he proposed a recreation restriction only. What these workers did was they tried to balance Mr. Sanders' mental health with the penological concerns of dealing with an extraordinarily violent inmate. He had smashed correctional officers' faces against cell bars. He had fashioned weapons to injure people. He had told correctional officers, if you come into my cell I'm going to kill you with this shank. So he was a significantly violent inmate, who they did a pretty good job of managing with the medications he was on and the therapy he was given. As to the Monell liability, plaintiff has failed to prove Monell liability in any of its forms. Plaintiff first says that Wexford failed to implement a policy requiring the mental health professionals to take his condition into account during the disciplinary process, but we know there was a policy. The IDOC issued an administrative directive telling the mental health workers that they needed to become involved in this process at some point in 2014, and that's exactly what they did in authoring these Form 443 forms. Alternatively, counsel argues that Wexford had a widespread practice that a prisoner must be suicidal to receive treatment. There is no widespread practice evidence in this record. There is no comparator inmate evidence that was offered by Mr. Sanders. Recognizing that, he then argues that his Monell claim is satisfied by showing repeated violations of his own rights, and here he cites the Woodward decision, which is completely different than the circumstances we have here. In Woodward, the health care provider knew that nurses were showing up drunk to work every day, that they weren't following policy, that they weren't assessing mentally ill inmates, and the conduct was so pervasive that it inculpated corporate fault. Those facts are not here. When discussing his own experience, again, Mr. Sanders doesn't tell the full story. He says that he received one therapy session in 2013, but he was evaluated by a psychiatrist twice, a psychologist four times just between April and December of 2013, and he refused to see Dr. McCormick, the psychiatrist, on two other occasions. So Mr. Sanders failed to prove his Monell liability under any theory. For all these reasons, we would ask that you affirm summary judgment on all claims in favor of all defendants. Thank you. Thank you, counsel. Mr. Oliver U. Feinberg, anything further? Your Honor, what you heard from counsel for defendants is their preferred account of the facts and the inferences they would like a fact finder to draw. The district court, however, took their invitation and found the facts. I'd like to address, and that's grounded in the fact         I'd like to address a question you had raised earlier about causation. The Seventh Circuit case, Connor v. Reinhard, states that the requisite causal connection is satisfied if the defendant set in motion a series of defense that they knew or should have reasonably known would cause others to deprive the plaintiff of her constitutional rights. That's also echoed in a district court decision about saying that the Adjustment Committee personal involvement does not hinge on who has the ultimate authority for constitutionally offensive decisions. That's McCleary v. Coughlin out of New York. I'd like to address a couple other small points. We understand that part of a defendant's argument is that Mr. Sanders was receiving medication for his mental illness or seen by a psychiatrist who prescribed medication. However, our expert has stated that psychotherapy is important and that defendants who are charged with the therapy aspect of the care team failed to meet their professional responsibility. And courts have held that treatment with psychotropic medication alone can constitute no treatment at all if not paired with psychotherapy. Our view is that providing Mr. Sanders with medication and only passing by his cell to eyeball him is the mental health equivalent of treating appendicitis with an aspirin. We would also invite the panel to look at page 484 to 85 of the prior decision in Mr. Sanders' prior appeal in which the court stated that this is a story of inadequate care and recognize the pattern that Mr. Sanders indisputably received flurries of additional attention and care following self-harm. And the same facts were before that panel as they are before this panel today. Finally, our position here is that a reasonable jury could find... Let me say I'm puzzled by that last comment. Certainly the first Sanders decision and I think the second dealt with the face of the complaint and whether the complaint had to be processed. This is a case on summary judgment. So how can it be that the very same record is before the court now as it was in the earlier appeals? Was there no evidence introduced on summary judgment? In the prior appeal, the full summary judgment record in the second appeal, the full summary judgment record was available to the Seventh Circuit in that... None of which was discussed. It was discussed as... It was discussed in the opinion and it was used as a contrast to... It was context for the complaint and it was because they had argued that... It was a sanctions decision in which they had argued that Mr. Sanders had lied in his pleadings and the evidence was looked at compared to the full summary judgment record because summary judgment briefing, the same briefing before this court, had already been submitted. Okay. I think we understand your position. Thank you, counsel. Thank you so much. The case will be taken under advisement.